Larry MARSHAK, Plaintiff,

v.

Rick SHEPPARD, Mike Vogel, and A.S.V., INC., Defendants.

No. 86 Civ. 9960 (MP).

United States District Court, S.D. New York.

Aug. 11, 1987.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe by Stephen B. Judlowe, Claudia A. Smith, Mary Dashke, and Marcus & Marcus, New York City by Clark Marcus, Kathy N. Rosenthal, for plaintiff.

Zavin, Sinnreich & Wasserman, New York City by Jonathan Zavin, Marya Lenn Yee, Richard Wasserman, for defendant Rick Sheppard.

Joseph E. Zyncak, P.C., New York City by Christopher R. Whent, for defendants Mike Vogel and A.S.V., Inc.

## OPINION AND DECISION

MILTON POLLACK, Senior District Judge.

This is an action for infringement of a United States registered service mark, and for the wrongful use in commerce of false designations of origin, false descriptions and false representations, all in violation of the Lanham Trademark Act of 1946, 15 U.S.C. §§ 1114(1), 1116–1118, 1125(a); for infringement and dilution of service mark and trademark and trade name rights under the statute and under common law; and for unfair competition. Jurisdiction is based on 15 U.S.C. § 1121 (suits for infringement of United States registered trademarks and service marks); and 28 U.S.C. § 1338(b) and 15 U.S.C. § 1125(a) (unfair competition actions). Venue in this court is proper under 28 U.S.C. § 1391(b). The issues were tried to the Court at a Bench trial.

Plaintiff Larry Marshak is the manager of a performing group known as "The Drifters." In that capacity plaintiff has promoted, advertised and maintained the goodwill of the performing group known as "The Drifters," and as such, has acquired a valuable property right therein. Plaintiff is the owner of United States Registration No. 1,081,338 for the service mark "The Drifters," which was registered January 3, 1978. The mark covers entertainment services, namely vocal and instrumental music, rendered by a group and of the goodwill of the business connected with the use and symbolized by the service mark "The Drifters." This registered service mark was duly and lawfully issued and is in full force and effect.

The defendant Rick Sheppard, was, and still is, engaged in the field of entertainment and, from time to time, has performed under the group name "Rick Sheppard and The Drifters," thus competing with plaintiff in the field of entertainment. One of these performances was on November 26, 1986, at the Stratton Restaurant in Queens, New York, which is owned by defendant A.S.V., Inc. and managed by defendant Mike Vogel. None of Sheppard's performances as "Rick Sheppard and The Drifters" in the relevant period were authorized by plaintiff. Plaintiff contends that the defendants have profited thereby, and unless defendants' conduct is permanently enjoined plaintiff and his good-will and reputation will suffer irreparable injury.

Two answers have been filed, one for Sheppard, and the other for Vogel and A.S.V. The answers contain general denials and include several common affirmative defenses. Defendants state that Marshak is barred from his suit by laches, in that he has not vigorously protected his mark against Sheppard, who has been using it for over ten years; that Marshak has unclean hands in having appropriated a mark used by one Treadwell; that the mark was registered by fraud; that Marshak's assignors had no rights which they could transfer to Marshak; and that defendants' use of the mark was innocent because they didn't know that Marshak had registered it. Vogel says further that he was acting as an employee of A.S.V., Inc. and should not be held personally liable if A.S.V., Inc. is held liable.

Defendant Sheppard's Answer to the complaint contains eight counterclaims asserting: antitrust violation; violation of § 38 of the Lanham Act (procurement of a service mark by false or fraudulent declarations to the patent and trademark office); unfair competition; malicious prosecution; defamation; disparagement; inducement to breach the contractual relationship of third parties with said defendant; and interference with Sheppard's prospective business relations.

The relief sought in the Answer of the defendant Sheppard is that the service mark be ordered cancelled on the ground of procurement by fraud; that Marshak be permanently enjoined from holding himself out as manager of a performing group under the name of "The Drifters" and that the plaintiff respond in the amount of Sheppard's actual damages. The Answer of defendants Mike Vogel and A.S.V., Inc. prays that, if liability on the part of Sheppard is found, they be held to be merely innocent infringers within the meaning of 15 U.S.C. § 1114.

At the conclusion of the trial, on inquiry from the Court, defendant Sheppard conceded that he had not adduced any evidence of damages in support of any of his counterclaims, and consented in open Court to the dismissal of all those of his counterclaims seeking damages, leaving outstanding only those seeking cancellation of the plaintiff's mark and a ruling of unfair competition on plaintiff's part.

## BACKGROUND

In 1953 a singing group called "The Drifters" first appeared. Shortly after its formation, George Treadwell became the manager of the group. The membership of "The Drifters" thereafter underwent frequent change; at least twenty different individuals appeared as members of The Drifters between 1953 and 1976.

In 1958 Treadwell hired several members of another group, "The Crowns," to supplant individuals then performing as The Drifters. Among those who became the Drifters at that time were plaintiff's assignors, Dock Green, Elsbeary Hobbs, and Charles Thomas. Hobbs remained with the group through 1961, Green through 1962, and Thomas through 1967. The period of the early 1960s was a productive one for The Drifters, including the recording of several of their most popular songs, including "There Goes My Baby," (1959), "Save the Last Dance for Me," (1960), "Some Kind of Wonderful," (1961), "Up on the Roof," (1962), "On Broadway," (1963), and "Under the Boardwalk," (1964).

Treadwell operated The Drifters through a New York corporation, Drifters, Inc. Defendant Sheppard claims that all members of The Drifters signed employment contracts with Treadwell before performing in the group and that these contracts divested the performers of any rights in the name "The Drifters," at least as against Treadwell. Defendant offered evidence of one such contract between Drifters, Inc. and Charles Thomas.

Defendant Rick Sheppard performed as a member of The Drifters from 1966 to 1970. Treadwell died in 1967. After Treadwell's death, his widow Faye Treadwell continued to manage the group. Record royalties continued to flow to her, through Drifters, Inc., for Drifters records issued up to that time. Drifters, Inc., however was dissolved as a New York corporation in 1977, for tax delinquency.

In 1969, Thomas, Green, and Hobbs reunited to perform in revival shows as "The Drifters." This group came under the management of plaintiff Larry Marshak in the early 1970s.

In 1971, Drifters, Inc., the Treadwell corporation, brought an infringement suit in New York State Court against Thomas, Green, Hobbs, Marshak and several others. In the complaint, Drifters, Inc. stated that it had continuously used the name "Drifters" as the distinctive title for its appearances and that as a result of extensive exposure, the public had come to have a high regard for the performance and entertainment abilities of those connected with Drifters, Inc. The complaint in that suit alleged that defendants had used the name "Drifters," exploiting for their own gain the good will which had come to be associ-

594

ated with the use by Drifters, Inc. of that name. Drifters, Inc. accused Marshak's group of infringement and requested an injunction barring defendants from using the name "Drifters."

The State Court denied plaintiff a preliminary injunction against use of "The Drifters" by the defendants before it. In an opinion dated January 25, 1972, the court held: "plaintiff [Drifters, Inc.] has failed to establish its allegations that it has an established reputation in the entertainment field and that defendants have been infringing upon plaintiff's good name and good will. In fact, the evidence submitted apparently indicates that it is the defendants who have established such reputation and notoriety." On the subject of the employment contracts between Drifters performers and Drifters, Inc., the court noted, "There are serious questions raised respecting the validity of the purported contracts and whether or not plaintiff has fully complied with the contract terms and conditions." Final Judgment of dismissal of the suit was entered for defendants on May 6, 1973, including an award of costs to them.

The Drifters group managed by Marshak has performed with significant continuity and popularity since its inception in the early 1970s. Marshak testified that his group, which is billed as "The Drifters" or "The Drifters featuring Charlie Thomas," is booked through three major agencies and has appeared in all fifty states and abroad. Marshak's group has appeared in large arenas throughout the country, including performances in Madison Square Garden in New York, which were sold-out on seven to ten occasions. Marshak's group has appeared at baseball stadiums, amusement parks, concert halls, as well as the Kennedy Arts Center in Washington.

Marshak's Drifters were one of twelve groups selected to perform in the Soviet Union in 1976 as part of a bicentennial exchange. They performed in the White House for President Ford, on the battleship Intrepid as part of the anniversary celebra-

tion for the Statue of Liberty in New York, at the 75th Anniversary celebration of the New York Stock Exchange, and recently at a celebration of the United States Constitution, which was presided over by former Chief Justice Warren Burger.

In addition, Marshak's group has appeared on all three major commercial television networks, as well as the newer Fox network, HBO, and on public television. The group has appeared repeatedly on a well-known television show which features popular music, "Dick Clark's American Bandstand." They won a "mini-Emmy" for their appearance on an ABC show, "Motown returns to the Apollo," and have appeared on a beer commercial which has run over 225 times. Marshak's Drifters have made several records, audiotapes and music videos.

After her unsuccessful infringement suit against Marshak, Faye Treadwell continued to manage a singing group billed as "The Drifters." This group, like Marshak's group, included one or more performers who had previously appeared with The Drifters. There was convincing testimony, however, that the Treadwell group focussed more and more on foreign audiences toward the mid–1970s. Richard Nader, a major producer of shows featuring music of the 1950s and 1960s, testified that he had employed Treadwell's Drifters for several shows he presented at Madison Square Garden in 1970, 1971, and 1972. However, Nader stated that, by 1974–76, according to information he received from David Zaan of the Banner Talent Agency and from a conversation with Faye Treadwell herself, "[Treadwell's] Drifters were pretty much in Europe, and weren't coming back."

Nader testified that Mrs. Treadwell said that she was working in England now and wasn't available for his shows in New York; she was, as Nader related her conversation, "making so much money there, why come back?" Nader stated that, in the mid–1970s, when those in the music industry referred to "The Drifters", it was Marshak's group that was indicated.[1]

1. The Answer of Sheppard to the Complaint herein stated at ¶ 22 that: "Faye Treadwell maintained her New York corporation, Drifters, Inc., but moved her base of operations to the

Rick Sheppard, whose given name is Jordan Smith, left the Drifters in 1970, over a salary dispute with Mrs. Treadwell. Over the next few months, Sheppard was booked and performed under the names, "The Corporation," "Love Potion," "The Rick Sheppard Show," and "The Rick Sheppard Revue." Sheppard then attended the police academy and later qualified as a hospital security officer. Sheppard continued to perform in his free time, now sometimes billing himself as "Rick Sheppard of The Drifters" or "Rick Sheppard and the Drifters." Sheppard left his police job in 1974 to become a full-time singer.

In 1975, Marshak sued Sheppard in New York State court for unfair competition, arising from Sheppard's use of the name "Drifters." Marshak testified that, in a telephone conversation following the filing of the suit, Sheppard told Marshak that he had not approved the offending advertisement which precipitated the suit and that his use of the name "Rick Sheppard and the Drifters" was not essential to him.

On December 17, 1976, Green, Hobbs, and Thomas, acting through a partnership, applied for a federal trademark for an entertainment group called "The Drifters." At around the same time, Green, Hobbs, and Thomas assigned to Marshak all rights, title and interest in and to said service mark application. Attached to the trademark application was a declaration in which the three applicants stated "that to the best of their knowledge and belief no other person, firm, corporation or association has the right to use said mark [ "The Drifters" ] in commerce". The declaration concluded that "these statements were made with the knowledge that willful false statements and the like are made punishable by fine or imprisonment [and] may jeopardize the validity of the application." Trademark Trade Registration No. 1,081,- 338 was issued in the names of Green, Thomas and Hobbs on January 3, 1978.

In 1978, Marshak again sued Sheppard, this time for infringement of Marshak's registered service mark. In that action Sheppard interposed as a defense that Marshak's 1976 trademark was obtained by the false representations of his assignors in their application for registration. No attempt to procure a cancellation of the registration was made in that lawsuit.

Shortly after the 1978 suit was instituted by Marshak, a meeting of several of the parties thereto was held at the offices of David Zaan, President of Banner Talent Agency. Attending the meeting were Marshak, Sheppard, Zaan, and an associate of Zaan's. Zaan's and Marshak's testimony were essentially the same regarding the meeting. At the meeting, Sheppard agreed that he would cease performing as "Rick Sheppard and the Drifters" and would henceforth style himself at "The Rick Sheppard Revue," subject to completion of several outstanding contracts for performances in Canada as "Rick Sheppard and the Drifters." Zaan volunteered to assist Sheppard to obtain future bookings under the name "The Rick Sheppard Revue." Sheppard denied that such a meeting had ever occurred or that he had entered into such an agreement; the Court does not credit those denials. Marshak's 1975 and 1978 suits have remained pending but have never proceeded further than the pleading stage; Sheppard has been seemingly content to leave them outstanding against him.

Green, one of Marshak's assignors, resigned from the Marshak-managed group in 1979. He then formed another group, which he called "The Drifters." In July, 1979, Marshak sued Green in federal court in Manhattan. Marshak's claims against Green were very similar to those he now asserts against Sheppard: infringement of a registered trademark, unfair competition, and dilution of the trademark.

In *Marshak v. Green*, 505 F.Supp. 1054, 1058 (S.D.N.Y.1981), Judge Weinfeld held that Marshak had "clearly shown a likelihood of confusion" between Green's group and Marshak's. The court applied the well-known factors of *Polaroid Corp. v. Polar-*

United Kingdom in or about 1971 and since that date has, to the best of defendant's knowledge, not booked live performances by a singing group under the mark "The Drifters" in the United States."

*ad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.) (Friendly, J.), *cert. denied,* 360 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), determining that consumer confusion was likely because the groups had the same name, the same style, and perform in the same areas. The court found that Green, "in promoting [his] own group [was] trading on the name and goodwill of [Marshak's] group." *Marshak v. Green,* 505 F.Supp. at 1059. The court found that Marshak had affirmatively established "The Drifters" as a valuable name and that defendants "deliberately used the name aware they had no right thereto, with consequent confusion of the public." *Id.*

Recognizing that Marshak's registered trademark was prima facie evidence of the validity of the mark, Judge Weinfeld found that Green failed to meet his burden of showing that other groups had made rightful use of the name "The Drifters" after Marshak received the registered trademark in 1978.

Green, as Sheppard does now, challenged Marshak's trademark on the basis that it contained false statements as to plaintiff's exclusive, continuous and previous (to Green's) use of the trademark. The court held that defendants failed to prove that the trademark application contained anything but "insignificant" misrepresentations. *Id.* at 1060. The court also rejected Green's attack on the assignment which transferred his rights in the trademark to Marshak.

Judge Weinfeld concluded that "the record indicates that [Marshak's] mark is valid and strong" and that Green's actions constituted intentional infringement. *Id.* at 1061. The court granted Marshak a decree barring Green from performing under the name "The Drifters" and ordered an accounting to determine what part of defendants' gross income from the infringing use was profits, and thus payable to Marshak.

In 1983, Marshak filed an affidavit with the Patent and Trademark Office ("PTO") and received "incontestability" status for his mark. Incontestability status becomes available after five years of continuous use

of a registered mark, providing that there are no judicial proceedings pending concerning rights in the mark. Incontestability constitutes "conclusive evidence of the registrant's exclusive right to use" the registered mark, subject to certain exceptions, including the defense that the mark or the affidavit of incontestability contained material fraudulent statements. 15 U.S.C. § 1065; *See* 2 J.T. McCarthy, *Trademarks & Unfair Competition,* § 32:44 at 756–62 (2d ed. 1984).

There was conflicting evidence on the location and frequency of Sheppard's performances in the years 1978–86. Marshak testified that once Sheppard had played out the agreed-upon engagements in Canada in 1978 he heard nothing further about Sheppard until 1986, when he again heard of Sheppard performing as "Rick Sheppard and The Drifters" in the United States. Three major booking agents, familiar with the market for musical groups performing Drifters-era music, also testified that they had not heard of Sheppard's group in the 1978–86 period. Sheppard, however, testified that he had performed continuously from 1971 to 1986 as "Rick Sheppard and The Drifters." The documentary evidence adduced thereon was sparse and indicated that many of Sheppard's bookings were in Canada and that his performances in the U.S. during this period were of a relatively low profile.

Marshak testified that he learned through a booking agent that Vogel, as general manager of The Stratton, had engaged Sheppard to perform as "Rick Sheppard and The Drifters" on November 26, 1986 at The Stratton. Marshak telephoned Vogel and followed up with a telegram to him stating that "the group you are advertising and/or selling are a totally counterfeit group" and stating that unless he heard from Vogel immediately, "I shall be forced to protect my rights to the fullest extent of the law."

Vogel testified that he is a shareholder of A.S.V., Inc., which owns the Stratton, as well as being the general manager of The Stratton. Relying on documents supplied by Sheppard, he stated that he thought he

was hiring "The Drifters" when he contracted with Sheppard. Sheppard had told him personally, Vogel said, that Sheppard's group was "The Drifters." Both Sheppard and Marshak threatened Vogel with suit and both offered to provide legal services to protect him from a suit by the other. Vogel stated that he ultimately decided to use Sheppard's group because he thought Sheppard was a competent performer and because Sheppard had convinced him that he had the right to use the name "The Drifters." Vogel admitted to being confused between the two groups and their competing claims.

Marshak presented several witnesses who testified about the confusion caused by competing groups referencing themselves to "The Drifters." Steve Moore, an agent and producer since 1970, testified that he booked the Marshak Drifters group featuring Charlie Thomas and also recently had booked the Sheppard Drifters group, of whom he had first heard in 1986. Moore stated that, in terms of choreography and singing, "both groups do the same thing on stage." He stated that he informs his customers, who are club-owners who book entertainment groups, that there are competing Drifters groups. He stated that his customers will often hire whichever Drifters group is available.

Arnold Klein, founder of Mars Talent Agency, testified that he had booked the Marshak Drifters as early as 1976–77, and had booked that group approximately four to five times a month since 1980. Klein testified that he and Marshak had discussed a deal whereby Klein would pay Marshak $48,500 for the exclusive right to book Marshak's group during a given period. Klein stated that he withdrew from this arrangement because one of the potential customers called him and stated that he could not commit himself to hire Marshak's group because he had heard that Sheppard's group would be playing nearby at about the same time.

### DISCUSSION

■ Marshak's ownership of a trademark for "an entertainment group called 'The Drifters' " is "prima facie evidence of [his] exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(a). In an infringement action, such as the present one, the defendant has the burden of rebutting this statutory presumption of plaintiff's right to exclusive use. *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 747 F.2d 81, 86 n. 8 (2d Cir.1984), *cert. denied* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985).

Generally, success in an infringement action based on federal trademark law depends on "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.' " *Thompson Medical Co., v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985), *quoting Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). More specifically, the Second Circuit has applied a multi-faceted analysis to determine whether consumer confusion has occurred. *See Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.) *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

### I. Marshak's Registered Trademark

■ As discussed above, the fact of registration by Marshak is prima facie evidence of his exclusive right to the name "The Drifters." In fact, the statutory presumption in Marshak's case is "conclusive evidence" of his right to exclusively use the mark because his mark has received incontestability status. 15 U.S.C. § 1115(b).

In addition to the statutory presumption, plaintiff also enjoys the *stare decisis* effect of Judge Weinfeld's 1981 ruling that his mark is "valid and strong." *Marshak v. Green*, 505 F.Supp. at 1061. *See Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp.*, 502 F.2d 802, 805 (9th Cir.1974) (" [W]here faced with a prior ruling of this Court holding a substantially identical trademark valid, it was error to disregard the stare decisis effect of that ruling absent a strong showing that it was

'palpably erroneous' in fact or law.") (citation omitted).

Of course, defendants are not precluded from litigating the validity of the trademark by the doctrine of *res judicata,* because they were not parties to *Marshak v. Green.* Moreover, the *stare decisis* effect of a prior finding of validity of a trademark may be overcome if defendant "present[s] 'persuasive new evidence' of invalidity and demonstrate[s] that there is a 'material distinction' between the cases." *Illinois Tool Works, Inc. v. Foster Grant Co.,* 547 F.2d 1300, 1302 (7th Cir.1976), *cert. denied,* 431 U.S. 929, 97 S.Ct. 2631, 53 L.Ed.2d 243 (1977) (citation omitted).

The Lanham Act provides that the statutory presumption on behalf of the holder of a registered trademark, "shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a). Even where the mark has become incontestable, the statute allows challenge to the trademark on the basis that "the registration or the incontestable right to use the mark was obtained fraudulently." 15 U.S.C. § 1115(b)(1).

Sheppard urges that Marshak's service mark "be ordered cancelled on the grounds that it was procured fraudulently." The Court has power to cancel a registration under 15 U.S.C. § 1119. " [M]isstatements in a registration application provide a basis for cancelling the registration only if the misstatements (1) were made with *knowledge* of their falsity, and (2) were *material* to the determination to grant the application." *Rick v. Buchansky,* 609 F.Supp. 1522, 1537 (S.D.N.Y., *preliminary appeal dismissed,* 770 F.2d 157 (2d Cir.1985) (emphasis in original); *Five Platters v. Purdie,* 419 F.Supp. 372, 384 (D.Md.1976).

In their 1976 trademark application, Marshak's assignors (Hobbs, Thomas and Green) affirmed that no other party had the right to use the mark for which they were applying. Sheppard asserts that this was a knowing and material fraud upon the PTO because Hobbs, Thomas and Green knew that Mrs. Treadwell at that time managed another group using the name "The Drifters." Sheppard asserts that plaintiff's assignors knew that several other former Drifters had also performed with other groups which used the name "The Drifters."

The testimony at trial showed that Marshak's assignors made no willful, material misstatements in completing the application. Upon cross-examination of both Hobbs and Thomas, defendant Sheppard asked whether either of them knew of others using the name "Drifters" during the period preceding their trademark application. Hobbs stated that he knew of no such other groups; Thomas stated that he knew of some "phony" Drifters groups that were performing at the time. Thomas' belief that some "phony" groups were using the name is entirely consistent with his declaration to the PTO that no other person *had the right* to use the mark for which he applied.

Defendant Sheppard attempted to establish that Marshak's assignors knew of the Treadwell group's concurrent use. However, as noted above, the evidence credibly established that when the application was filed in 1976, Mrs. Treadwell had largely restricted her group's performances and use of the name "Drifters" to areas outside the United States. Neither did defendant Sheppard prove that his own use of "Rick Sheppard and the Drifters" in 1976, was substantial enough to cause any doubt about Hobbs' and Thomas' testimony that they had not heard of Sheppard's group when they filed the trademark application. The evidence failed to establish willful material misrepresentations in plaintiff's assignors' statement of exclusive use.

In the *Green* case, Judge Weinfeld considered the question of fraud on the PTO by Marshak's assignors. There, Green "contend[ed] that the application contains false allegations as to exclusive use, continuous use, and first use." Judge Weinfeld concluded that Green "utterly failed to present adequate proof that [Marshak's] group's use was not exclusive." *Green,* 505 F.Supp. at 1060. Sheppard's presentation was equally unavailing. Accordingly,

the Court holds that Marshak is entitled to the statutory presumption that he has exclusive rights to use the name "The Drifters."

## II. The Nature of Plaintiff's Mark and the Standard for Confusion

Despite the statutory presumption in favor of the holder of a registered trademark, "[i]t goes without saying that rights in a trademark are acquired through appropriation and use of the mark in commerce." *Rick*, 609 F.Supp. at 1531.

### A. Jus Tertii

■ A lurking issue in this case is the role of George Treadwell. Much of Sheppard's argument stems from his contention that George Treadwell's rights in the name "The Drifters" were superior to those of Marshak, and that Mrs. Treadwell has maintained these rights over time. Plaintiff, however, has forcefully argued that this case is *Marshak v. Sheppard,* and not *Marshak v. Treadwell:*

> "As a matter of policy, *jus tertii* should not be allowed as a defense in any trademark case. *So long as plaintiff proves rights superior to defendant, that is enough.* Defendant is no less an infringer because it is brought to account by a plaintiff whose right may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant. To permit a *jus tertii* defense would be an unwise judicial policy because it would expand many trademark disputes far beyond a mere two party conflict."

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 578 (D.N.J.1985) (emphasis in original), *quoting* 2 J.T. McCarthy *Trademark and Unfair Competition,* 675 (1974); *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1581 (Fed.

Cir.1984) ("The conflict here is between petitioner [appellee] and respondent [appellant] and not between petitioner and the world.") (citation omitted).

Sheppard concedes that "the issue in this case, and all that is at issue, is Marshak' rights vis-a-vis Sheppard." Nonetheless, Sheppard blithely continues to argue that Treadwell had the trademark rights to the name "The Drifters" and that Mrs. Treadwell did not abandon such rights. It is entirely clear that Treadwell was not before the Court and the rights of Treadwell were not litigated in this case. The issue here was whether defendants' actions infringed upon Marshak's trademark; Treadwell's rights, if any, are immaterial to this action.

### B. What Rights did Marshak's Assignors Obtain?

Sheppard claims that "Marshak has no rights because of his assignors' failure to acquire them in their employment relationship." Sheppard argues that Thomas, Hobbs, and Green could obtain no rights in the mark because "the group name "The Drifters" has never been personal to the group's members."

Sheppard cites several cases in which courts have held that the rights to a name of a performing group vested in the corporation set up to hold the group's assets, and that performers who left the group retained no rights in the group name. *E.g. Bell v. StreetWise Records, Ltd.,* 761 F.2d 67 (1st Cir.1985); *Rick,* 609 F.Supp. 1522; *Five Platters,* 419 F.Supp. 372; *Rare Earth, Inc. v. Hoorelbeke,* 401 F.Supp. 26 (S.D.N.Y.1975). Sheppard further argues that Marshak's assignors could obtain no rights in the name "The Drifters" because, upon joining Treadwell's Drifters, each signed employment contracts in which they waived all such rights.[2]

---

**2.** Sheppard's argument concerning the employment contracts is dubious for two reasons. First, the legal effect of these contracts was at issue before the New York State court which heard the suit by Drifters, Inc. against Marshak and others in 1971. In denying Mrs. Treadwell an injunction barring the use of the name "The Drifters" by Marshak's group, the court stated,

"Nor may such relief be predicated upon the existence of certain writings allegedly executed by two of the named defendants herein. There are serious questions raised respecting the validity of the purported contracts and whether or not [Drifters, Inc.] has fully complied with the contract terms and conditions."

These arguments miss the mark, however, because they could only accrue, if at all, to Treadwell's benefit, not to Sheppard's. Sheppard argues that the rights to "The Drifters" were lodged in the group's manager, Treadwell, and the corporation he set up to control the group's assets. In this case, however, when only Marshak's and Sheppard's rights are at stake, these arguments are irrelevant.

### C. *What Kind of Trademark is "The Drifters?"*

Section § 1114(1)(a) of Title 15 of the United States Code "provides a federal cause of action for trademark infringement when a "'colorable imitation of a registered mark ... is likely to cause confusion.'" *Twentieth Century*, 747 F.2d 81, 86–87, *citing* statute.

The first stage in assessing likelihood of confusion is to decide what level of trademark protection a given trademark is entitled to.

> "[T]here are four different levels of trademark protection: (1) generic (not entitled to protection even with proof of secondary meaning), (2) descriptive (entitled to protection with proof of secondary meaning), (3) suggestive (entitled to protection without proof of secondary meaning), and (4) arbitrary or fanciful (enjoying 'the rights accorded to suggestive terms as marks-without the need of debating whether the term is 'merely descriptive')"

*Twentieth Century*, 747 F.2d at 87, *citing Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9, 11 (2d Cir.1976) (other citation omitted).

■ There seems little doubt that the mark "The Drifters" is arbitrary, and thus entitled to maximum trademark protection. It is a use of a common word, "drifters," in an unfamiliar context—to refer to singers. The owner of an arbitrary mark need not show that his mark has acquired secondary meaning in order for the mark to be enti-

tled to protection. *See Abercrombie*, 537 F.2d at 11.

■ Sheppard argues that "long-term concurrent use, as evidenced by [Marshak's] failure to prosecute infringers, affects the mark's distinctiveness." Sheppard states that so many groups have used the name "The Drifters," that it is no longer arbitrary, but has become descriptive in that "Drifters" now is a descriptive name for a certain type of singing group. Sheppard concludes that, because "The Drifters" is no more than descriptive, Marshak must prove secondary meaning—i.e. that when the public thinks of "The Drifters," they think specifically of Marshak's Drifters among all the other groups similarly named. *See Twentieth Century*, 747 F.2d at 90; *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938).

However, as noted above, Sheppard has failed to prove any significant concurrent use by others of the name "Drifters" so as to diminish the distinctiveness of the mark. Moreover, far from showing a failure to prosecute infringers, the evidence adduced shows that Marshak has been extremely diligent in doing so. There was evidence submitted of over 50 court actions in which Marshak has successfully sued or settled with others over use of the name "The Drifters." Thus, the Court holds, Marshak's mark is arbitrary, not descriptive.

### III. *Likelihood of Confusion: The POLAROID Factors*

■ In order to show infringement, Marshak must prove that consumers are likely to be confused as to source between Sheppards' use of the name "Rick Sheppard and The Drifters," and the Marshak group's use of the name "The Drifters." The time-tested analysis for likelihood of confusion in the Second Circuit was enunciated by Judge Friendly:

> "[The] strength of [the] mark, the degree of similarity between the marks, the proximity of the products, the likelihood

---

Second, Sheppard is not a third-party beneficiary of these contracts. They were not entered with any intent to benefit him and thus he may

not now enforce Treadwell's alleged contractual rights for his own benefit.

that the owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of the defendant's product, and the sophistication of the buyers ... the court may have to take still other variables into account."

*Polaroid,* 287 F.2d at 495.

As has already been indicated, plaintiff's mark is arbitrary and strong. It is registered and has received incontestability status. "The Drifters," as managed by Marshak, are a well-known singing group who have appeared widely in the United States over many years. The group has received national exposure on television and by live performances at national commemorative events.

Sheppard contends that the designations of his group and Marshak's are not very similar, relying on the difference between Marshak's use of "The Drifters" and Sheppard's use of "Rick Sheppard and the Drifters." However, the cases are clear that the addition of a qualifying term to a trademark, rather than eliminating confusion, tends to cause confusion. *See, e.g. A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972) ("La Crosse by Bradley" created likelihood of confusion with "Cross" pens); *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970) ("Cuti-Trim" created likelihood of confusion with "Trim."). It is clear that defendant's use of "Rick Sheppard and the Drifters" carries the common-sense implication that Rick Sheppard will be appearing with "The Drifters." Since Marshak owns the mark for a group providing entertainment services as "The Drifters," the result is inevitable confusion between Sheppard's group and Marshak's.

As to "proximity and quality of trademarks," this factor again favors Marshak. There has been no allegation that Sheppard limits his services to some specific geographic region of the U.S., where Marshak's Drifters do not perform. Both groups are prepared to perform widely in all areas of the United States.

Marshak has submitted substantial evidence of "actual confusion." Vogel testi-fied as to his confusion between the two groups when he was lobbied by both Sheppard and Marshak. He stated that, when customers buy tickets to hear "The Drifters," they expect to see the group that performed all the familiar hits. Moore testified that clubs book the groups interchangeably. Klein stated that the fee which he could get for a performance of Marshak's group would be significantly lessened if Sheppard's group performed contemporaneously in the same vicinity. The reason is consumer confusion—consumers identify either group as the source of live entertainment identified with "The Drifters."

Concerning the issue of "good faith," Sheppard admitted at trial that he has been aware, since at least the time of Marshak's 1978 action against him, that Marshak was the owner of a federally registered trademark for "The Drifters." Thus, Sheppard's use of the mark "The Drifters" in 1986 was not innocent.

The parties disagree on what constitutes the relevant market. Sheppard contends that the relevant buyers are the booking agents and club managers who purchase a groups' services. Sheppard states that these buyers are sophisticated, and know the difference between Marshak's Drifters and "Rick Sheppard and The Drifters." Marshak responds that it is the ticket-buying public who are the buyers and that they will be confused by Sheppard's promotion, thinking that he is actually appearing with "The Drifters." Furthermore, Marshak adds that, even among booking agents, Sheppard's group causes confusion, citing deposition testimony by Vogel in which he states that when he hired Sheppard, he thought he was hiring "The Drifters."

The conclusion of the court in *Marshak v. Green* concerning the likelihood of confusion between Marshak's Drifters and the rival group founded by Green is equally applicable here, where Marshak sues Sheppard: "Plaintiff [Marshak] has clearly shown a likelihood of confusion. Defendant's group has performed in the same areas and in the same style as plaintiff's'

they use the same name; they are in direct competition." *Marshak v. Green,* 505 F.Supp. at 1058–59.

### IV. Sheppard's Equitable Defense: Laches

■ Sheppard asserts that Marshak should be barred from monetary damages because he has "slumbered on his rights" in not suing Sheppard until 1986 when, Sheppard alleges, Marshak has known that Sheppard has been using the mark since the early 1970s.

"Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time."

*Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980), *quoting Cuban Cigar Brands, N.V. v. Upmann International, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd* 607 F.2d 995 (2d Cir. 1979) (citations omitted).

The evidence does not support Sheppard's contention that Marshak has known of Sheppard's infringement and taken no action. Marshak sued Sheppard in 1975 and 1978. After the 1978 suit, Sheppard assured Marshak that he would cease the allegedly infringing behavior. Marshak has not "slumbered on his rights."

### V. Unfair Competition and the State Law Claims

#### A. False Designation and Unfair Competition

In Count Two of the Complaint, Marshak alleges that Sheppard has violated 15 U.S.C. § 1125(a), which bars the application of a "false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent" goods. Count Two also alleges state law violations of unfair competition.

However, no separate analysis is required for these claims because "the 'law of trademarks is but a part of the law of unfair competition' and the same test is applied in determining each claim." *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916), *quoted in American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 664 (2d Cir.1979); *New West Corp. v. NYM Co. of California,* 595 F.2d 1194, 1201 (9th Cir.1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical."); *Bi-Rite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188, 1192 (S.D.N.Y.1983) ("All of plaintiffs' trademark and unfair competition claims, other than their state dilution claim, are resolved by the application of a single set of principles.")

#### B. New York's Anti-Dilution Statute

■ Count Three of Marshak's complaint alleges trademark infringement under New York common law and violations of New York's anti-dilution statute. N.Y.Gen.Bus. Law § 368–d. As discussed above, trademark infringement is governed by the analysis used under the Lanham Act.

"Dilution refers to a whittling away of an established trademark's distinctiveness, and hence its selling power, through its unauthorized placement on dissimilar products.... When consumers are confronted with dissimilar use of a strong trademark they tend no longer to associate the mark with the quality reputation that a producer may have established in the market. Section 368–d provides injunctive relief to holders of marks that suffer such dilution."

*Bi-Rite,* 555 F.Supp. at 1196. An anti-dilution claim under the New York statute does not require a finding of public confusion. It does however require "a mark of sufficient distinction to warrant the statute's special protection and there must be a blurring or tarnishing of the plaintiff's mark sufficient to constitute dilution." *Warner Bros. Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 248 (2d Cir. 1983); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538,

544–45, 369 N.E.2d 1162, 1166, 399 N.Y. S.2d 628, 632 (1977).

Marshak has established a mark of sufficient distinction, given the statutory presumption from his registration and the length and notoriety of his use. The evidence, particularly relating to the lower fees Marshak's group may garner when Sheppard's group appears in the same area, demonstrates that Sheppard's use has been substantial enough to constitute dilution of Marshak's mark in the public mind. "The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer-like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade-mark or name." *Allied*, 42 N.Y.2d at 544, 369 N.E.2d at 1166, 399 N.Y.S.2d at 632.

## VI. Sheppard's Counterclaims

Neither of the two counterclaims which defendant did not abandon after trial has been established by the evidence.

Sheppard's second counterclaim claims a violation of 15 U.S.C. § 1120, which states a cause of action for anyone injured by "[a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation." Plaintiff's assignors were not shown by credible evidence to have made willful, fraudulent declarations or representations to the PTO in connection with the application for the registered trademark for "The Drifters." Sheppard failed on his burden to establish fraud, willfulness or misrepresentation sufficient to warrant cancellation of the service mark.

Sheppard's third counterclaim alleges unfair competition by Marshak. The alleged offending actions are Marshak's use and enforcement of his trademark: e.g., using the name "The Drifters" for his group's performances, suing alleged infringers, and contacting potential purchasers and urging them not to purchase services from alleged infringers. Marshak's trademark is valid. Therefore, each of these actions is proper. Actions taken in good faith reliance upon ownership of a federally registered intellectual property right are lawful. *See e.g. Maclaren v. B–I–W Group, Inc.*, 329 F.Supp. 545, 548 (S.D.N.Y.1971) (patent); *Lucien Lelong, Inc. v. Dana Perfumes, Inc.*, 138 F.Supp. 575, 582 (N.D.Ill 1955) (trademark). Plaintiff's good faith was credibly established.

## VII. Remedies

Upon a finding of infringement, courts have conducted a "balancing of the equities" in determining whether to grant injunctive relief against an infringer. *Rick*, 609 F.Supp. at 1542. Three interests are balanced: those of the senior user, those of the junior user, and those of the public. *See id.; Lambda Electronics, Corp. v. Lambda Technology Inc.*, 515 F.Supp. 915, 924 (S.D.N.Y.1981). Traditional equitable principles are employed, particularly relevant being the good faith of the trademark holder and the infringer. *Rick*, 609 F.Supp. at 1542.

Here, we are not facing a situation where an infringer acted in innocent ignorance of the rights of the trademark holder. Marshak's suits of 1975 and 1978 put Sheppard on notice that Marshak had a trademark, and, by the time of the latter suit, a federally registered trademark. In this sense, this suit is identical to *Marshak v. Green*. There Judge Weinfeld stated:

"Moreover, the infringement was intentional. 'That [defendants] persuaded [themselves they] had a legal right to pursue the course [they] did diminishes neither the fact of [their] violation of [Marshak's] rights, nor the force of its impact upon the consumer. That a course is stubbornly pursued does not render it innocent. The very persistence in the infringing conduct over the prompt protest of [Marshak] not only emphasizes its willfulness, but continues the wrong, entitling [Marshak] to judicial redress.'

Marshak is thus entitled to a decree as sought by him enjoining defendants from continuing to perform under the name 'The Drifters' or any variant thereof. The decree shall include a prohibition against use of the mark 'The Drifters' on

any billboard or other promotional material and a requirement that defendants surrender to plaintiff any promotional materials bearing the name "The Drifters.'" *Marshak v. Green*, 505 F.Supp at 1061 (citation omitted).

Marshak is entitled to the same injunctive relief against Sheppard here as he obtained against Green in the earlier case.

The parties have stipulated that "in the event the Court shall find liability on the part of Sheppard in the instant action, the damages to be assessed against Sheppard shall be in the amount of $6465.00, which amount is determined by 1986 performance revenues of $30,800.00, less expenses of $24,335.00 against such revenues, for which defendant Sheppard has provided receipts satisfactory to counsel for plaintiff." The Court, accordingly, awards said amount of $6465.00 as damages due plaintiff from defendant Sheppard. The Court, in its discretion, however, declines to "multiply" these damages under the facts and circumstances of this case. *See* 15 U.S.C. § 1117.

Plaintiff has shown that A.S.V., Inc. received $5140 in receipts for the day Sheppard performed at The Stratton, and that A.S.V., Inc. paid Sheppard a $1500 fee for his performance. A.S.V., Inc. itself has thus set the value to it of Sheppard's performance, namely at $1500. This represents that defendant's own estimate of the damages that plaintiff is entitled to recover and the Court accordingly awards said sum of $1500 to the plaintiff against the defendant A.S.V., Inc. The defendant Vogel, with full knowledge of the registered trademark and with notice that Sheppard's claim to the service mark was unsubstantiated other than by his mere assertion thereto, deliberately involved himself in the infringement and accordingly is culpable and responsible for the damages incurred by plaintiff, jointly and severally with A.S.V., Inc.

In "exceptional cases," the court may award attorneys fees to the prevailing party for a violation of 15 U.S.C. § 1114. 15 U.S.C. § 1117. These "exceptional" cases are those in which the infringement was malicious, fraudulent, willful, or deliberate. *Marshak v. Green*, 505 F.Supp. 1054, 1062 n. 25 (S.D.N.Y.1981); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 746–47 (7th Cir.1985); *Five Platters*, 419 F.Supp. at 385.

Here, Sheppard's infringement was clearly willful and deliberate. He had been alerted at least by the time of the 1978 state court suit that Marshak possessed a federally registered trademark covering the name "The Drifters." Yet, he continued to seek and obtain profit from the use of that name, combined with his own, from time to time thereafter. However, as was held appositely in *Marshak v. Green*, this Court rules that, "despite defendant's intentional infringement of plaintiff's mark, the Court, exercising its discretion, finds that the circumstances do not warrant an award of attorneys' fees in this case. Plaintiff is entitled to taxation of statutory costs." 505 F.Supp. at 1062.

### CONCLUSION

Plaintiff shall submit a Decree in accordance with the foregoing on five days notice.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.